**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| JOHN H. PAGE,<br><br>　　　　　*Plaintiff*,<br><br>　　v.<br><br>GINA M. RAIMONDO,<br><br>　　　　　*Defendant*. | Case No. 1:22-cv-01416 (ACR) |

**<u>MEMORANDUM OPINION AND ORDER</u>**

　　Plaintiff John H. Page, a D.C. resident proceeding *pro se*, hopes to vote in congressional elections but acknowledges that the District of Columbia has no right to any representation in the U.S. House of Representatives.  To get around this difficulty, he seeks an order compelling Defendant Gina M. Raimondo, the U.S. Secretary of Commerce, to list the population of "Columbia" in the census data she reports to the President for use in apportioning congressional seats.  What is Columbia?  According to Plaintiff, Columbia is a fifty-first state coextensive with the District that Congress admitted to the Union in 1801.  Alternatively, if the Court declines to find that a state has existed for over 200 years without anyone noticing, Plaintiff asks the Court to authorize him and other D.C. residents to vote in House elections in Maryland.

　　Plaintiff's plea for representation raises weighty questions of fairness and democratic legitimacy.  But those policy questions are beyond the Court's jurisdiction.  And, given Plaintiff's wholly insubstantial legal arguments, so too is this case, which the Court dismisses without prejudice.[1]

---

[1] The Court dismisses without prejudice because any jurisdictional dismissal must operate without prejudice.  *E.g.*, *Havens v. Mabus*, 759 F.3d 91, 98 (D.C. Cir. 2014).

# I.     BACKGROUND

## A.     Legal and Historical Background

The Constitution's District Clause—Article I, section 8, clause 17—authorizes Congress

"[t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, by

Cession of particular States, and the Acceptance of Congress, become the Seat of the

Government of the United States."  U.S. Const. art. I, § 8, cl. 17.  This District—the modern

District of Columbia—now comprises territory ceded by Maryland shortly after the Founding.

*See Adams v. Clinton*, 90 F. Supp. 2d 35, 51-53, 57-58 (D.D.C.) (three-judge panel) (per curiam),

*aff'd mem. sub nom. Alexander v. Mineta*, 531 U.S. 940 (2000), *and aff'd mem.* 531 U.S. 941

(2000).  It formerly also included areas ceded by Virginia, but Congress retroceded those areas to

the state in 1846.  *Id.* at 53.  The District, whose residents now number about 690,000, *District of*

*Columbia: 2020 Census*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/

stories/state-by-state/district-of-columbia-population-change-between-census-decade.html

[https://perma.cc/5FYL-DSS4], has never had representation in Congress.[2]  *See, e.g.*, *Adams*, 90

F. Supp. 2d at 53.

Litigants have repeatedly challenged this disenfranchisement in court.  A few such cases

foreshadow some of Plaintiff's arguments and so are particularly relevant here.  In 1964, an

unsuccessful candidate for U.S. Senate in Maryland—apparently seeking to mix up the voter

pool—sought a declaratory judgment that D.C. residents have a constitutional right to vote in

U.S. Senate elections in Maryland.  *Albaugh v. Tawes*, 233 F. Supp. 576, 576 (D. Md.) (three-

---

[2] The District does have a congressional "delegate" whom the House has, at certain times (including the present), allowed to vote in some committees.  *See, e.g.*, *Rules of the House of Representatives*, 118th Cong., R. 3 (2023), https://rules.house.gov/sites/republicans.rules118. house.gov/files/documents/Rules%20and%20Resources/118-House-Rules-Clerk.pdf [https:// perma.cc/6BWL-2YQ4].  *See generally Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994).

judge panel) (per curiam), *aff'd*, 379 U.S. 27 (1964) (per curiam).  A three-judge district court

dismissed the suit for failure to state a claim, *Albaugh*, 233 F. Supp. at 578, and the Supreme

Court summarily affirmed,[3] *Albaugh*, 379 U.S. at 27.  In 2000, in *Adams*, a collection of D.C.

residents and the District itself "challenge[d] as unconstitutional the denial of their right to elect

representatives to the Congress of the United States."  90 F. Supp. 2d at 37.  Concluding that

Article I restricts representation in the House to "true states and not the District," the three-judge

district court dismissed their claims, *id.* at 48, and again the Supreme Court summarily affirmed,

*Adams*, 531 U.S. at 941; *Alexander*, 531 U.S. at 940.  Finally, another collection of D.C. voters

asserted that the District's lack of congressional suffrage violates an assortment of constitutional

provisions in *Castañon v. United States*, 444 F. Supp. 3d 118 (D.D.C. 2020) (three-judge panel),

*aff'd mem.*, 142 S. Ct. 56 (2021).  *See id.* at 122.  The lower court dismissed that case, too, *id.* at

149, and once more the Supreme Court summarily affirmed, 142 S. Ct. at 56.

### B.       Plaintiff's Litigation Campaign

Plaintiff—a D.C. resident and taxpayer, Dkt. 22 (Am. Compl.) ¶ 38—is no stranger to

litigation about D.C. voting rights.  His first foray into the field was a *pro se* amicus brief before

the district court in *Castañon*.  *See* Memorandum of Law of Amicus Curiae John H. Page in

Support of Plaintiffs in Part and in Support of Defendants in Part, *Castañon*, 444 F. Supp. 3d 118

(No. 18-cv-2545).  Perhaps surprisingly, his brief sided with the defendants, albeit on technical

grounds: consistent with his arguments here, Plaintiff asserted that the *Castañon* plaintiffs should

have sought congressional representation through the purported State of Columbia (which, recall,

---

[3] Litigants may directly appeal decisions of three-judge district courts to the Supreme Court.  28 U.S.C. § 1253.

Plaintiff contends is geographically coextensive with the District), rather than the District itself. *Id.* at 4.

Plaintiff struck out on his own in *Page v. Biden* (*Page I*), No. 20-cv-104, 2021 WL 311002 (D.D.C. Jan. 29, 2021), *aff'd*, No. 21-5038, 2021 WL 4767945 (D.C. Cir. Oct. 1, 2021) (per curiam).  Again previewing the theory on which he relies here, Plaintiff "[a]lleg[ed] that there is already a state—the State of Columbia—that overlaps geographically with the District," and sought "an injunction requiring [President Joseph R. Biden Jr.] to include Columbia's residents in the congressional apportionment calculation following the decennial census." *Id.* at *1.  Concluding that it lacked jurisdiction to enter the requested injunction against the President, the court dismissed the case without prejudice, *id.*, and the D.C. Circuit affirmed, 2021 WL 4767945, at *1.

Undaunted, Plaintiff filed this case against both President Biden and Secretary Raimondo—who is responsible for submitting to the President the census data used in apportioning House seats among the states, *see* 13 U.S.C. § 141(b)—in May 2022, invoking the same state-within-the-District theory he presented in *Page I*.  Dkt. 1.  In an August 2023 Minute Order, the Court dismissed the claims against President Biden for the reasons stated in *Page I* and invited Plaintiff to file an amended pleading clarifying the relief he seeks from Secretary Raimondo.  Min. Order of Aug. 10, 2023.  Plaintiff then filed the operative Amended Complaint against only Secretary Raimondo.  Am. Compl.  He seeks a declaratory judgment recognizing the existence of the State of Columbia and requiring Defendant to submit amended census apportionment data that includes Columbia as a state.  Am. Compl. ¶ 48.  Alternatively, he requests an order permitting him and other D.C. residents to vote in House elections in Maryland.  *Id.* ¶¶ 49-50.  Defendant has moved to dismiss the Amended Complaint.  Dkt. 23 (Mot.).

4

## II.    LEGAL STANDARD

A district court ordinarily must refer a case, like this one, that "challenges the constitutionality of the apportionment of congressional districts" to a three-judge court.  28 U.S.C. § 2284(a).  But a court must dismiss a complaint for lack of jurisdiction—and need not convene a three-judge court under § 2284—where the plaintiff's claims are "wholly insubstantial and frivolous."[4]  *Shapiro v. McManus*, 577 U.S. 39, 45-46 (2015) (quoting *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)); Fed. R. Civ. P. 12(h)(3).

"'[C]onstitutional insubstantiality' for this purpose has been equated with such concepts as 'essentially fictitious,' 'wholly insubstantial,' 'obviously frivolous,' and 'obviously without merit.'"  *Shapiro*, 577 U.S. at 45-46 (cleaned up).  These "adverbs [a]re no mere throwaways," and "[c]onstitutional claims [should] not lightly be found insubstantial."  *Id.* (cleaned up).  Instead, the "determination of substantiality . . . often demands of the district judge an exceedingly close analysis of [a plaintiff's] constitutional claims vis-a-vis prior case law."  *Feinberg v. FDIC*, 522 F.2d 1335, 1339 (D.C. Cir. 1975).  Although a claim is not necessarily insubstantial simply because it contravenes existing Supreme Court precedent, to avoid dismissal of such a claim for want of jurisdiction, the plaintiff must advance a nonfrivolous argument for reversing that precedent.  *See Holmes v. FEC*, 823 F.3d 69, 74 (D.C. Cir. 2016).

---

[4] Defendant styles her Motion as one to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6).  Mot. at 9-10.  But she also repeatedly asserts that Plaintiff's claims are "frivolous" or "insubstantial" and asks the Court to dismiss the case without convening a three-judge court, *e.g.*, Mot. at 17-19—something the Court can do only if it finds that it lacks jurisdiction, *see Shapiro v. McManus*, 577 U.S. 39, 44-45 (2015).  Since the parties have fully briefed the (in)substantiality of Plaintiff's claims and the Court must, in any event, dismiss the case sua sponte if it lacks jurisdiction, *see* Fed. R. Civ. P. 12(h)(3), it construes the Motion as one to dismiss for lack of jurisdiction.

The Court is mindful of its obligation to treat *pro se* litigants, such as Plaintiff, with "solicitude," *Kim v. United States*, 840 F. Supp. 2d 180, 191 (D.D.C. 2012), *aff'd*, 707 F.3d 335 (D.C. Cir. 2013), including by liberally construing their filings, *Richardson v. United States*, 193 F.3d 545, 548 (D.C. Cir. 1999).  But "even a pro se plaintiff must comply with the Federal Rules of Civil Procedure," *Hedrick v. FBI*, 216 F. Supp. 3d 84, 93 (D.D.C. 2016), and the Court cannot hear any case, even one brought by a *pro se* litigant, that falls outside its subject matter jurisdiction, *see, e.g.*, *Fontaine v. Bank of Am., N.A.*, 43 F. Supp. 3d 1, 3 (D.D.C. 2014).

## III.    ANALYSIS

Plaintiff emphasizes that, to qualify for congressional suffrage, he must be a resident of a state.  *E.g.*, Dkt. 24 (Opp.) ¶¶ 2, 10, 30; Am. Compl. ¶¶ 28, 35, 49.  He also concedes that the District is not a state.  *E.g.*, Dkt. 31 (Surreply) ¶ 5; Opp. ¶ 24(b); Am. Compl. ¶¶ 16, 32, 46.  To square this circle, Plaintiff argues that he is a resident of Columbia,[5] a fifty-first state coterminous with the District.  He argues in the alternative that the Court should hold that he and other D.C. residents may vote for Congress in Maryland.  After "close analysis," *Feinberg*, 522

---

[5] Before we had Lady Liberty and Uncle Sam, we had Lady Columbia.  In 1697, Chief Justice Samuel Sewall of the Massachusetts Bay Colony "suggested that the American colonies be called Columbina, a feminized version of Christopher Columbus'[s] last name." *Goddess of Liberty Figure*, Smithsonian Nat'l Museum of Am. Hist., https://americanhistory.si.edu/ collections/nmah_693815 [https://perma.cc/5RH7-G9U4].  While that name did not stick for our nation, a female Columbia "became a symbol for American ideals during . . . the American Revolution, the War of 1812, and World War I." *Id.*  Thus, New York City's early private college is named Columbia University; companies have names such as Columbia Records, Columbia Pictures, and the Columbia Broadcasting System; and our nation's capital is, natch, the District of Columbia.  *See id.*; Garance Franke-Ruta, *When America Was Female*, The Atlantic (Mar. 5, 2013), https://www.theatlantic.com/politics/archive/2013/03/when-america-was-female/273672 [https://perma.cc/746G-ZM84].  Unfortunately for Plaintiff, however, Columbia has never been used as the name of an American state.

F.2d at 1339, the Court concludes that these arguments are "wholly insubstantial" and dismisses

them for lack of jurisdiction,[6] *Shapiro*, 577 U.S. at 45 (cleaned up).

### A.      There Is No State of Columbia, and Plaintiff's Arguments to the Contrary Are Frivolous

"New States [must] be admitted by the Congress . . . ."  U.S. Const. art. IV, § 3, cl. 1.

Plaintiff contends that Congress exercised this power to admit the State of Columbia in 1801.

*E.g.*, Am. Compl. ¶ 5.  The text of the statutes that Plaintiff cites provides no support whatsoever

for this theory.  Nor do other relevant interpretive tools.  And Plaintiff's counterarguments hold

no water.  The upshot is that Plaintiff has not presented a substantial federal question.

### 1.      Plaintiff's arguments plainly lack any support in the statutory text

The statute that Plaintiff identifies as admitting Columbia into the Union unambiguously

did no such thing.  Plaintiff points to the following language in the Organic Act of 1801, the

statute in which Congress established the original government for the District: "[T]he laws of the

state of Maryland, as they now exist, shall be and continue in force in that part of the . . .

[D]istrict, which was ceded by that state to the United States."  An Act Concerning the District

of Columbia, ch. 15, § 1, 2 Stat. 103, 104-05 (1801); *see* Am. Compl. ¶ 5; *Adams*, 90 F. Supp. 2d

at 56 (describing the Organic Act).  Nothing in that language at all suggests that Congress

intended to admit a new state to the Union.  Instead, as *Adams* explained, this section "did

---

[6] One might expect that, if Plaintiff's claims are "obviously without merit," *Shapiro*, 577 U.S. at 46 (cleaned up), the Court could conclude without spilling much ink that Defendant wins. However, the question the Court must answer is not whether Plaintiff or Defendant has the better of the argument on the merits.  Instead, the question is whether Plaintiff's claims are so obviously defective that the Court must dismiss them for lack of jurisdiction.  Answering that question requires "an exceedingly close analysis of [Plaintiff's] constitutional claims." *Feinberg*, 522 F.2d at 1339.  The Court therefore reviews Plaintiff's (many) arguments in detail to assess whether there is any even arguable basis on which this case can proceed.  The reader should not conclude that the length of this analysis correlates with the viability of Plaintiff's theories.

nothing more than fix [Maryland's laws] (as they stood as of that date) as a part of the common law *of the District*; without such a provision the new District would have had no laws upon which to build." 90 F. Supp. 2d at 60 n.46.  Plaintiff's alternative reading that the statute created a new state is "obviously without merit."  *Shapiro*, 577 U.S. at 46 (cleaned up).

Plaintiff argues that the 1791 Maryland state statute that ceded the land that became the District provides necessary context for interpreting the 1801 Act.  The purportedly relevant section of that statute declared:

> That all that part of the said territory, called Columbia, which lies within the limits of this state, shall be and the same is hereby acknowledged to be for ever ceded and relinquished to the congress and government of the United States, in full and absolute right, and exclusive jurisdiction, as well of soil as of persons residing, or to reside, thereon, pursuant to the tenor and effect of the eighth section of the first article of the constitution of government of the United States; provided . . . that the jurisdiction of the laws of this state, over the persons and property of individuals residing within the limits of the cession aforesaid, shall not cease or determine until congress shall by law provide for the government thereof, under their jurisdiction, in manner provided by the article of the constitution before recited.

1791 Md. Laws ch. 45, § 2.  Plaintiff makes two arguments based on this language; each is frivolous.

The first takes some unpacking.  As the Court understands it, Plaintiff interprets the phrase "pursuant to the tenor and effect of the eighth section of the first article of the constitution of government of the United States" as a limiting clause, restricting Congress's jurisdiction over the ceded area to only those powers constitutionally delegated to Congress.  *Id.*; *see* Am. Compl. ¶ 4.  He then argues that (1) only states—and not the federal government—can administer congressional elections, (2) authority over congressional elections in the District must therefore have passed to some authority other than Congress, and thus (3) the Court should conclude that

Congress impliedly admitted Columbia as a state to fill that gap.  *See* Am. Compl. ¶ 4.  That reading has at least two obvious problems.  First, far from seeking to withhold any authority from Congress, the statute unambiguously "ceded and relinquished [the District] to the congress and government of the United States, in full and absolute right, and exclusive jurisdiction."  1791 Md. Laws ch. 45, § 2.  And rather than limiting Congress's authority, the "pursuant to" language underscores the breadth of that concession, since the cited constitutional provision—Article I, section 8—gives Congress authority to "exercise exclusive Legislation in all Cases whatsoever, over [the] District."  U.S. Const. art. I, § 8, cl. 17; *see, e.g.*, *Palmore v. United States*, 411 U.S. 389, 397 (1973) (recognizing that Congress's power over the District "is plenary").  Second, Plaintiff's argument begs the question—it assumes that Plaintiff has a right to congressional representation, and that since it cannot come through the District, it must come through a state. As discussed below, that assumption flouts settled Supreme Court precedent, and Plaintiff makes no nonfrivolous argument to overcome that precedent.  Plaintiff's notion that a tortured reading of a centuries-old Maryland state statute requires the Court to recognize a fifty-first state is "essentially fictitious."  *Shapiro*, 577 U.S. at 45 (cleaned up).

Plaintiff's other argument is only slightly less convoluted.  It relies on the 1791 statute's proviso that "the jurisdiction of the laws of [Maryland], over the persons and property of individuals residing within the limits of the [District], shall not cease or determine until congress shall by law provide for the government thereof."  1791 Md. Laws ch. 45, § 2; *see, e.g.*, Opp. ¶ 13(c) & n.1.  Plaintiff reads this language to require Congress to afford D.C. residents the same congressional suffrage they enjoyed while citizens of Maryland, which, he argues, Congress could do only by admitting Columbia as a state (or by allowing D.C. residents to continue to vote through Maryland—a theory the Court addresses below).  Even setting aside the question

whether remaining under "the jurisdiction of the laws of [Maryland]" implies a right to congressional suffrage, Plaintiff again plainly misreads the statute, which provides only that Maryland would retain jurisdiction over the District until "congress . . . by law provide[d] for the government thereof"—something it did well over 200 years ago.  *See Adams*, 90 F. Supp. 2d at 59 (discussing Congress's assumption of control over the District).  Plaintiff's interpretation is again "obviously without merit."  *Shapiro*, 577 U.S. at 46 (cleaned up).

A comparison of the Organic Act to statutes by which Congress *did* admit new states reinforces this point.  For instance, the nearly contemporaneous 1802 statute admitting Ohio as a state provided:

> That the inhabitants of the eastern division of the territory northwest of the river Ohio, be, and they are hereby authorized to form for themselves a constitution and state government, and to assume such name as they shall deem proper, and the said state, when formed, shall be admitted into the Union, upon the same footing with the original states, in all respects whatever.

*Act of Apr. 30, 1802, ch. 40, § 1, 2 Stat. 173, 173 (1802); see also, e.g.*, An Act for the Admission of the State of Tennessee into the Union, ch. 67, 1 Stat. 491, 491-92 (1796) (unambiguously admitting "the State of Tennessee"); An Act for the Admission of the State of Vermont into this Union, ch. 7, 1 Stat. 191, 191 (1791) (same for "[t]he State of Vermont").  In other words, Congress "does not . . . hide elephants in mouseholes" when admitting new states. *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001).

## 2. Other interpretive tools confirm that Plaintiff's theory is wholly insubstantial

That Plaintiff's theory rests on such a clear misreading of the relevant statutes already puts this case in jurisdictionally frivolous territory.  At the risk of gilding the lily, however, the Court notes that various other interpretive sources—including constitutional text and purpose,

precedent, and settled historical practice—confirm that Plaintiff's argument is "wholly insubstantial." *Shapiro*, 577 U.S. at 45 (cleaned up).

Start with the constitutional text. The District Clause empowers Congress "[t]o exercise exclusive Legislation in all Cases whatsoever, over such District . . . as may, *by Cession of particular States*, and the Acceptance of Congress, become the Seat of the Government of the United States." U.S. Const. art. I, § 8, cl. 17 (emphasis added). That language contemplates a District made up of territory *ceded* by states—not within a new state. Underlining this point, the same clause grants Congress "like Authority over all Places purchased by the Consent of the Legislature of the State *in which the Same shall be*." *Id.* (emphasis added). That is, when the Framers intended that territory under federal control remain part of a state, they said so explicitly. Plaintiff's theory thus finds no support in the Constitution's text, which contemplates a District outside of any state.

That arrangement makes good sense in light of the Framers' purpose in enacting the District Clause: "[E]nsuring that Congress would not have to depend upon another sovereign for its protection." *Adams*, 90 F. Supp. 2d at 50. As *Adams* explained:

> [T]he District Clause was adopted in response to an incident in Philadelphia in 1783, in which a crowd of disbanded Revolutionary War soldiers, angry at not having been paid, gathered to protest in front of the building in which the Continental Congress was meeting under the Articles of Confederation. Despite requests from the Congress, the Pennsylvania state government declined to call out its militia to respond to the threat, and the Congress had to adjourn abruptly to New Jersey. The episode, viewed as an affront to the weak national government, led to the widespread belief that exclusive federal control over the national capital was necessary.

*Id.* at 50 n.25 (cleaned up); *see also Fort Leavenworth R.R. Co. v. Lowe*, 114 U.S. 525, 528-29 (1885) (discussing this history); Ron Chernow, *Alexander Hamilton* 180-83 (2004) (same). Or,

as Madison put it: "[D]ependence of the members of the general government on the State comprehending the seat of the government for protection . . . might bring on the national councils an imputation of awe or influence equally dishonorable to the government and dissatisfactory to the other members of the Confederacy."  The Federalist No. 43, at 272 (James Madison) (Clinton Rossiter ed., 1961).  Accepting Plaintiff's contention that the District wholly overlaps with a state would upend this constitutional purpose.[7]

Precedent, too, conflicts with Plaintiff's theory.  Most obviously, as detailed below, the Supreme Court has repeatedly summarily affirmed lower-court decisions holding that D.C. residents' exclusion from the congressional franchise is constitutional.  *See Castañon*, 444 F. Supp. 3d at 122, *aff'd mem.*, 142 S. Ct. 56; *Adams*, 90 F. Supp. 2d at 72, *aff'd mem. sub nom. Alexander*, 531 U.S. 940, *and aff'd mem.* 531 U.S. 941.  Both that Court and the D.C. Circuit have confirmed in dicta that "[r]esidents of the District lack the [congressional] suffrage."  *Heald v. District of Columbia*, 259 U.S. 114, 124 (1922); *accord Loughborough v. Blake*, 18 U.S. (5 Wheat.) 317, 324 (1820) (Marshall, C.J.) (observing that the District "has voluntarily relinquished the right of representation, and has adopted the whole body of Congress for its legitimate government"); *Banner v. United States*, 428 F.3d 303, 309 (D.C. Cir. 2005) ("[T]he Constitution denies District residents voting representation in Congress.").  Those decisions would be mistaken—or, at least, correct only in the most technical of senses—if D.C. residents

---

[7] Plaintiff acknowledges that the Framers "did not want the U.S. government to be influenced . . . or . . . threatened by militia from a surrounding state" but asserts that "this is no objection to the case presented here" because "Defendant's compliance with her administrative duties would not result in the State of Columbia's being able to raise a militia."  Am. Compl. ¶ 41.  But when Congress admits a new state to the Union, it must do so on equal terms with all other states.  *See Coyle v. Smith*, 221 U.S. 559, 567, 573 (1911).  Congress either admitted Columbia as a coequal state or it did not; there is no such thing as a quasi-state that exists only for administrative convenience.

also lived in a State of Columbia, since the Constitution guarantees each state "at Least one Representative." U.S. Const. art. I, § 2, cl. 3. So too would be the Supreme Court's holding in *Hepburn v. Ellzey*, 6 U.S. (2 Cranch) 445 (1805) (Marshall, C.J.), that D.C. residents are not citizens of a "state" within the meaning of Article III's grant of diversity jurisdiction. *Id.* at 452-53; *see also Palmore*, 411 U.S. at 395 ("The District of Columbia is constitutionally distinct from the States." (cleaned up)). In fairness, Plaintiff is probably correct in responding that litigants in those cases did not think to present his state-within-the-District theory. *E.g.*, Opp. ¶ 24(b). But that two centuries of litigants and jurists did not think of it says much about the viability of Plaintiff's position.

Commentary from the time of the Framing and the District's formation sends a similar message. Madison, for example, observed in Federalist No. 43 that D.C. residents would "be allowed" a "municipal legislature for local purposes"; that phrasing contrasts with his adjacent reference to "the legislature of the State" that would cede the territory to form the District. The Federalist No. 43, *supra*, at 272-73. Supreme Court Justice Joseph Story noted explicitly that "inhabitants [of the District] . . . are not indeed citizens of any state, entitled to the privileges of such." 3 Joseph Story, *Commentaries on the Constitution of the United States* § 1218 (1833). And, as other courts have observed, numerous historical sources "indicate[] a contemporary understanding that residents of the District would not have a vote in the national Congress."[8]

---

[8] Plaintiff cites a failed constitutional amendment proposed by Alexander Hamilton at the New York ratifying convention that would have required Congress to allow for "District representation" in Congress once the District reached some unspecified minimum population, *Adams*, 90 F. Supp. 2d at 51 (cleaned up), as evidence that the Framers did not intend to disenfranchise D.C. residents permanently. Opp. ¶ 36(c). To the contrary, the proposal implies that Hamilton did not believe that the Constitution, as eventually adopted, granted D.C. residents a voice in Congress. *See Adams*, 90 F. Supp. 2d at 51.

*Adams*, 90 F. Supp. 2d at 51; *see id.* at 51-53 (collecting sources).  Again, such an understanding would be inexplicable were D.C. residents also residents of a State of Columbia.

Perhaps most damning for Plaintiff is more than 220 years' unbroken historical practice of utterly ignoring the supposed State of Columbia.  *Cf., e.g.*, *Chiafalo v. Washington*, 591 U.S. 578, 592 (2020) ("Long settled and established practice may have great weight in a proper interpretation of constitutional provisions." (cleaned up)).  There has never been an elected Columbia government; indeed, for much of the last two centuries, there has not even been an elected D.C. government.  *See Adams*, 90 F. Supp. 2d at 47 n.19.  Columbia has never sent any Representatives or Senators to Congress.[9]  *Cf.* U.S. Const. art. I, § 2, cl. 3 (guaranteeing each state "at Least one Representative"); *id.* art. I, § 3, cl. 1 (requiring two Senators per state).  Nor has Columbia ever appointed any presidential electors—though the District has done so under the Twenty-Third Amendment, such that D.C. residents would be double-counted in the Electoral College if Columbia existed.  *See* U.S. Const. amend. XXIII.  This inaction has persisted despite longstanding activism and controversy concerning D.C. residents' political voicelessness.  *See, e.g.*, *Castañon*, 444 F. Supp. 3d at 139 n.8 (discussing political activity in this area).  If there were a state hidden in the nation's capital, someone would have noticed before now.

---

[9] Plaintiff tries to explain this lack of representation, at least early in the District's history, as a product of the region's small population.  *See* Am. Compl. ¶ 20.  But the Constitution would have entitled Columbia to at least one Representative and two Senators regardless of its population; contrary to Plaintiff's argument, a state need not achieve some minimum "sufficient population for apportionment."  *Id.*; *see* U.S. Const. art. I, § 2, cl. 3; *id.* art. I, § 3, cl. 1.  And, however small their number, D.C. residents were concerned about their lack of congressional representation from the first.  *See Adams*, 90 F. Supp. 2d at 51-53.  Indeed, as Plaintiff acknowledges, residents of the portion of the District originally ceded by Virginia sought and obtained retrocession at least in part because of a desire for full suffrage.  *See id.* at 53 & n.33; William Tindall, *Origin and Government of the District of Columbia* 108, 110 (1907); Opp. ¶ 36(d).

Given the universal nonacknowledgment of Columbia's existence, Plaintiff's theory would raise a host of practical dilemmas. With no state government in place, who would administer Columbia's congressional elections? And who would be eligible to vote in those elections? The Constitution requires that House voters "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature," U.S. Const. art. I, § 2, cl. 1— what does that mean in a state with no legislature? In the same vein, the Constitution calls for a state's "Executive Authority" to "issue Writs of Election to fill [any] Vacancies" that might arise in its congressional delegation, *id.* art. I, § 2, cl. 4—who fills that role in a state with no governor? The Court has no idea (and doubts its jurisdiction to set up a new state government from scratch).

In sum, whatever approach one takes, Plaintiff's state-within-the-District claim is plainly frivolous.

### 3.     Plaintiff's remaining counterarguments are obviously meritless

Plaintiff offers a hodgepodge of other arguments in support of Columbia's existence. None presents even an "arguable" federal question. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998).

First, Plaintiff argues that he must be a resident of a state because he pays federal income taxes, which, he believes, the Sixteenth Amendment permits Congress to impose only on state residents. *E.g.*, Am. Compl. ¶ 32(a). That is an obvious misreading of that Amendment, which gives Congress "the power to lay and collect taxes on incomes . . . *without* apportionment among the several states." U.S. Const. amend. XVI (emphasis added). Both the Supreme Court and the D.C. Circuit have held that Congress may tax D.C. residents despite their lack of congressional representation. *See Heald*, 259 U.S. at 124; *Breakefield v. District of Columbia*, 442 F.2d 1227,

1229-30 (D.C. Cir. 1970) (per curiam); *see also Loughborough*, 18 U.S. at 325 (holding, even before Sixteenth Amendment, that Congress could tax D.C. residents).  Consistent with those decisions, another court in this District has held that a similar no-taxation-without-representation argument is "insubstantial." [10]  *Hobson v. Tobriner*, 255 F. Supp. 295, 299 (D.D.C. 1966).  Plaintiff offers no nonfrivolous response to these precedents; indeed, other than dismissing *Loughborough* as predating the Sixteenth Amendment, Surreply ¶ 7, he offers no response at all.

Second, Plaintiff argues that, if the Organic Act (and the creation of the District) did not create a new state, then it would be unconstitutional on various grounds, such that the Court should construe the Act as admitting Columbia to avoid declaring it unconstitutional.  *E.g.*, Opp. ¶ 20(a).  That argument has two obvious shortcomings.  First, while a court "may interpret ambiguous statutory language to avoid serious constitutional doubts, . . . that canon of construction applies only when ambiguity exists," and a court may "not rewrite a law to conform it to constitutional requirements."  *Iancu v. Brunetti*, 588 U.S. 388, 397 (2019) (cleaned up).  Plaintiff's reading of the Organic Act is entirely baseless, and the Court cannot rewrite the statute to align with his interpretation.  Second, Plaintiff has made no nonfrivolous argument showing that creation of the District without an overlapping State of Columbia is unconstitutional.

---

[10] While the argument is "insubstantial" as a legal matter, it is a weighty one in terms of fairness to the District's residents.  Not for nothing, the motto on the District's license plates is "End Taxation Without Representation."  John Kelly, *The Story Behind the District's "Taxation Without Representation" License Plates*, Wash. Post (July 3, 2021, 6:18 PM), https://www.washingtonpost.com/local/dc-license-plates/2021/07/03/2a87418a-db64-11eb-9bbb-37c30dcf9363_story.html [https://perma.cc/8XKU-XQZA].  District residents pay more in federal taxes per person than do residents of any state, and more in total than do the residents of twenty-two states.  Maya Efrati, *DC Statehood Explained*, Brennan Ctr. for Just. (Mar. 18 2022), https://www.brennancenter.org/our-work/research-reports/dc-statehood-explained [https://perma.cc/5Y6S-4XJX].

Much of Plaintiff's briefing focuses on Article I, section 2, which provides (as relevant here) that "[t]he House of Representatives shall be composed of Members chosen every second Year by the People of the several States," and that "Representatives . . . shall be apportioned among the several States . . . according to their respective Numbers."  U.S. Const. art. I, § 2.  Plaintiff agrees that, under this section, he must be a resident of a state to vote for Congress.  *E.g.*, Opp. ¶¶ 2, 10, 30; Am. Compl. ¶¶ 28, 35, 49.  And he concedes that the District is not a state.  *E.g.*, Surreply ¶ 5; Opp. ¶¶ 21, 24(b); Am. Compl. ¶¶ 16, 32, 46.  Notwithstanding those concessions, Plaintiff argues that this section in some way entitles him to congressional representation, such that the Court must infer that a State of Columbia exists to fill the gap.  All the evidence against Columbia statehood—constitutional text, purpose, precedent, and settled practice—cuts against his theory.  *See supra* Section III.A.2.

The Supreme Court's affirmances in *Adams* and *Castañon*, in particular, render Plaintiff's claim "wholly insubstantial."  *Shapiro*, 577 U.S. at 45 (cleaned up).  In both cases, three-judge district courts concluded that—far from guaranteeing D.C. residents congressional suffrage—Article I, section 2 specifically deprives them of House representation.  *See Castañon*, 444 F. Supp. 3d at 139, 145; *Adams*, 90 F. Supp. 2d at 45-65, 71-72.  In both cases, the plaintiffs appealed to the Supreme Court, arguing that Article I, section 2 at least *permits* congressional representation for D.C. residents.  *See* Jurisdictional Statement and Appendix at 25-33, *Castañon*, 142 S. Ct. 56 (No. 20-1279); Jurisdictional Statement at 14-28, *Alexander*, 531 U.S. 940 (No. 99-2062);[11] *see also Ill. State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173,

---

[11] Two separate groups of plaintiffs appealed the panel decision in *Adams*; only one—the *Alexander* plaintiffs—focused on Article I, section 2.  The other group—the *Adams* plaintiffs—concentrated on an equal protection argument.  *See* Jurisdictional Statement, *Adams*, 531 U.S. 941 (No. 00-97).  For convenience, since both appeals arose from the same underlying district court case, the Court refers to that litigation collectively as "*Adams*."

182-83 (1979) (explaining that lower courts should review jurisdictional statements to determine issues decided by summary affirmances).  And in both cases, the Supreme Court summarily affirmed.  *Castañon*, 142 S. Ct. at 56; *Alexander*, 531 U.S. at 940; *see also Castañon*, 444 F. Supp. 3d at 139 (concluding that "the Supreme Court must have affirmed the *Adams* holding that . . . Article I contemplates that only 'residents of actual states' have and may exercise the House franchise").  While summary, those affirmances bind this Court.  *Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975).

Plaintiff's attempt to distinguish these decisions by observing that neither considered his state-within-the-District theory, *e.g.*, Opp. ¶ 24(b), does not solve the problem.  *Adams* and *Castañon* squarely considered whether D.C. residents' lack of congressional suffrage is permissible under Article I, section 2.  Both concluded that it is.  So Plaintiff cannot tenably argue that failure to interpret the Organic Act to create a State of Columbia would render the Act unconstitutional, at least without presenting some nonfrivolous argument to distinguish or undermine those cases.  Because he has failed to do so, his case obviously lacks merit.  *See Holmes*, 823 F.3d at 74.

Even without those decisions, Plaintiff's claim would plainly fail as a matter of basic logic.  At bottom, he essentially argues that Article I, section 2 somehow guarantees him a right to live in a state.  But while that provision gives every qualified U.S. citizen who resides in a state a right to vote in congressional elections, it does not mean that every U.S. citizen resides in a state.  *See* U.S. Const. art. I, § 2, cl. 1; *Adams*, 90 F. Supp. 2d at 66; Opp. ¶ 30 ("[A] citizen of the U.S. does not have rights of representation through that citizenship, only through their citizenship of one of the several States.").  As Plaintiff acknowledges, many U.S. citizens are residents of territories and thus neither live in states nor have any right to vote for Congress.  *See*

Am. Compl. ¶ 15(c); *Castañon*, 444 F. Supp. 3d at 146-47; *Adams*, 90 F. Supp. 2d at 45-46; *Segovia v. United States*, 880 F.3d 384, 390 (7th Cir. 2018).  Plaintiff points out that the District is not a "territory" as that term is used in the Constitution, *see* U.S. Const. art. IV, § 3, cl. 2, but it is no less "constitutionally distinct from the States," *Palmore*, 411 U.S. at 395.

Plaintiff also asserts that, by creating and administering the District without an underlying state, Congress would be acting beyond its constitutional authority in violation of the Tenth Amendment.  *See* U.S. Const. amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.").  Yet the congressional actions to which Plaintiff objects either did not happen or plainly fall within Congress's authority under the District Clause.  For example, Plaintiff asserts that "Congress lacks the power to extinguish a sovereign state or involuntarily take part of a State."  Am. Compl. ¶ 12.  Congress did not "involuntarily take" the territory that became the District; Maryland ceded it.  1791 Md. Laws ch. 45, § 2.  And Congress accepted it in precisely the manner contemplated by the Constitution.[12]  *See* U.S. Const. art. I, § 8, cl. 17.  Plaintiff has not made any judicially cognizable Tenth Amendment claim.

Plaintiff also cites the Fourteenth Amendment's Equal Protection Clause, though he provides little explicit discussion of its relevance.  Am. Compl. ¶¶ 30, 45.  The Court infers that he means to rely on the Supreme Court's decision in *Evans v. Cornman*, 398 U.S. 419 (1970).

---

[12] Plaintiff also asserts that Congress cannot "deprive[]" former state residents "of their right to representation through their state."  Am. Compl. ¶ 11.  That power—in the context of creating the District—obviously follows from Congress's authority to "[a]ccept[]" an area ceded by a state to form the District.  U.S. Const. art. I, § 8, cl. 17.  But, in any event, Congress has not "deprived" any current D.C. resident of state citizenship.  The District has not been a part of Maryland for over two centuries.  Any living D.C. resident was either born a citizen of the District—and so never lived in a state—or chose to move here, voluntarily relinquishing state citizenship.  *See Adams*, 90 F. Supp. 2d at 61.

There, the Court held that Maryland violated the Equal Protection Clause by not allowing residents of a federal enclave (the National Institutes of Health)—over which Congress may exercise the same exclusive authority as over the District, *see* U.S. Const. art. I, § 8, cl. 17— located in Maryland to vote in state elections.  398 U.S. at 419, 426.  The Court observed that the enclave residents remained residents of Maryland, and that, although Congress could in theory exercise exclusive jurisdiction over the area, in practice it had not done so, but had instead "permitted the State[] to extend important aspects of state powers over" the enclave.  *Id.* at 421-24.  As a result, the area's residents were "just as interested in and connected with electoral decisions as they were [before] . . . the area came under federal jurisdiction and as [were] their neighbors who live[d] off the enclave."  *Id.* at 426.  The state therefore could not deny them the same voting rights it granted to other state residents.  *Id.*  Presumably, Plaintiff means to argue that, under *Evans*, it would be unconstitutional to deny him, as a resident of the federal District, representation in Congress while allowing it for residents of federal enclaves, and so the Court must infer the existence of a state in which he can vote.  Even setting aside the many other problems with Plaintiff's Columbia-statehood theory, *Evans* does not realistically help Plaintiff for at least two reasons.

First, both the *Adams* and the *Castañon* plaintiffs argued before the Supreme Court that *Evans* required providing D.C. residents with congressional representation.  Jurisdictional Statement and Appendix at 11-12, 33-35, *Castañon*, 142 S. Ct. 56; Jurisdictional Statement at 7, 10, 15-18, *Adams*, 531 U.S. 941 (No. 00-97).  Yet the Supreme Court summarily affirmed both district courts' dismissal of the plaintiffs' equal protection claims.  *Castañon*, 142 S. Ct. at 56; *Adams*, 531 U.S. at 941.  Plaintiff does not discuss, much less try to distinguish, these holdings.

*Cf. Holmes*, 823 F.3d at 74.  As a result, there is no possible constitutional problem for Columbia statehood to remedy.

Second, *Evans*'s conclusion that the Equal Protection Clause forbids providing differential voting rights to similarly situated citizens *within* a state does not mean that residents of the states—or even of federal enclaves within the states—and of the District are entitled to the same congressional representation.  On the contrary, as discussed above, the Constitution explicitly contemplates a District *outside* of any state.  Unlike the enclave residents in *Evans*— who, the Court emphasized, remained Maryland citizens and over whom Congress had declined to exercise exclusive jurisdiction, 398 U.S. at 421-24—Plaintiff lives outside a state in a District over which Congress has exercised exclusive jurisdiction.  *See* U.S. Const. art. I, § 8, cl. 17 (providing for a District formed "by Cession of particular States" and enclaves located "in" "State[s]").  Plaintiff has raised no substantial equal protection claim—let alone one that could even arguably warrant creating a State of Columbia out of whole cloth.[13]

Finally, none of the other authorities Plaintiff cites in any way justifies recognizing Columbia as a state.  Plaintiff suggests that Defendant has violated the so-called equal-footing doctrine by treating Columbia unequally from other states.  *See* Am. Compl. ¶¶ 46-47; *Coyle v. Smith*, 221 U.S. 559, 567, 573 (1911) (requiring that Congress admit any new states on equal terms with existing ones).  That argument matters only if Columbia is a state; it is not an

---

[13] If Plaintiff instead means to cite *Evans* in support of his argument that, if Columbia is not a state, then he should be able to vote in Maryland, he runs into not only the more general flaws in that argument identified below, *see infra* Section III.B, but also *Adams*' discussion of *Evans* specifically.  The *Adams* district court rejected the theory that *Evans* requires allowing D.C. residents to vote in Maryland, and, after the plaintiffs again cited *Evans* on appeal, the Supreme Court summarily affirmed.  *See Adams*, 90 F. Supp. 2d at 62-65; *Alexander*, 531 U.S. at 940; Jurisdictional Statement at 7, 23-24, *Alexander*, 531 U.S. 940.  So far as the Court can tell, Plaintiff makes no effort, let alone a nonfrivolous one, to distinguish that decision.  *Cf. Holmes*, 823 F.3d at 74.

independent reason to treat Columbia as such.  If anything, recognizing Columbia as a state only for purposes of congressional elections and with most other traditional state functions assigned to Congress would create, not remedy, an equal-footing problem.  Plaintiff's claim that Defendant has violated Columbia state law similarly assumes that there is such a state, Am. Compl. ¶ 45; since there obviously is not, the claim goes nowhere.

## B.    Plaintiff's Alternative Argument that He May Vote in Maryland Is Also Wholly Insubstantial

Plaintiff's alternative theory—that, if the District is not a state, the Constitution requires that he and other D.C. residents be allowed to vote in Maryland—fares no better.  Multiple Supreme Court decisions preclude his position, and Plaintiff's brief effort to distinguish them is "obviously without merit."  *Shapiro*, 577 U.S. at 46 (cleaned up).  Even absent these decisions, Plaintiff's position makes no sense.

Plaintiff's argument runs headlong into at least two Supreme Court decisions.  First, in *Albaugh*, the district court rejected a claim that D.C. residents have a right to vote in Maryland's congressional elections, concluding that, "[s]ince the Organic Act of 1801, it has been uniformly recognized . . . that residents of the District of Columbia are no longer citizens of the State of Maryland."  *Id.* at 577-78 (cleaned up).  The plaintiff appealed, raising many of the same arguments advanced by Plaintiff here—including that "the Organic Act was not intended to 'repeal the existing Maryland Congressional election regulations which defined the District of Columbia as a part of the State of Maryland,' since it provided 'that the laws of the State of Maryland, as they now exist, shall be and continue in force.'"  *Adams*, 90 F. Supp. 2d at 57 n.36 (cleaned up) (quoting Jurisdictional Statement at 6, *Albaugh*, 379 U.S. 27 (No. 481)).  The Supreme Court was having none of it and summarily affirmed.  379 U.S. at 27.

The *Adams* plaintiffs similarly asserted that "residents of the District should be permitted to vote in congressional elections through Maryland, based on a theory of 'residual' citizenship in that state." 90 F. Supp. 2d at 56. The district court rejected this argument both because *Albaugh* precluded it and, independently, because "the Maryland citizenship of the District's inhabitants was extinguished upon the completion of the transfer of the seat of the national government to the territory of the District." *Id.* at 57. On appeal to the Supreme Court, the plaintiffs renewed their argument for the right to vote in Maryland, asserting—much like Plaintiff—that "the cession legislation that created the national capital was and is incapable of taking away the constitutional rights of District residents" and that "[a]lthough the cession legislation may take away District residents' Maryland citizenship for most purposes," it could not "strip them of their constitutional right to vote in congressional elections, nor . . . of their state citizenship to the extent that that citizenship is inextricably linked to rights of national citizenship." Jurisdictional Statement at 20, *Alexander*, 531 U.S. 940. Again the Supreme Court summarily affirmed. 531 U.S. at 940.

Plaintiff makes no nonfrivolous effort to distinguish these precedents. The closest he comes is asserting that *Adams* "did not take into account" the 1791 Maryland cession statute's stipulation "that the jurisdiction of the laws of [Maryland], over the persons and property of individuals residing within the limits of the cession . . . shall not cease or determine until congress shall by law provide for the government thereof, under their jurisdiction, in manner provided by [Article I, 8]." Opp. ¶ 13(c) & n.1. As discussed above, however, by that statute's clear terms, any residual jurisdiction Maryland exercised over the District expired more than two centuries ago when Congress created a new government under its District Clause powers. *See Adams*, 90 F. Supp. 2d at 59. Plaintiff's interpretation of the statute as creating an indestructible,

indefeasible right to vote in Maryland elections is "essentially fictitious," *Shapiro*, 577 U.S. at 45 (cleaned up), and does not get him around *Adams* and *Albaugh*, which plainly foreclose his voting-in-Maryland theory.

Of course, Plaintiff's theory would raise eyebrows even were this the first Court to encounter it. As Chief Justice Marshall observed in 1805, "[b]y the separation of the [D]istrict . . . from the state of Maryland, [D.C. residents] ceased to be . . . citizen[s] of that state." *Reily v. Lamar*, 6 U.S. (2 Cranch) 344, 356-57 (1805); *see also supra* Section III.A.2 (discussing evidence that District is distinct from any state). Plaintiff recognizes as much. Am. Compl. ¶ 9 (acknowledging that, when Maryland ceded the territory that became the District, its residents "ceased to be citizens of . . . Maryland"). The District now is no more a part of (and Plaintiff is no more a resident of) Maryland than of Alaska or Hawaii.

As a result, Plaintiff's requested relief would raise several novel constitutional problems. The Court understands Plaintiff to seek to vote in Maryland only in congressional elections; he claims that the Court should treat Maryland as his state only "with respect to [his] . . . right to representation in Congress." Opp. ¶ 13(c). If he hopes to vote for Congress in Maryland, however, he must "have the Qualifications requisite for Electors of the most numerous Branch of the State Legislature." U.S. Const. art. I, § 2, cl. 1. And if he aspires not just to vote but also to run for office himself, to represent Maryland in the House he must "be an Inhabitant of that State." *Id.* art. I, § 2, cl. 2; *see Adams*, 90 F. Supp. 2d at 60 n.47 (describing this requirement as an "important piece of evidence" against allowing D.C. residents to vote in Maryland). The Court cannot reconcile these requirements with Plaintiff's proposal to become a limited-purpose Marylander. That proposal would have at least teetered on the edge of frivolity before *Adams*

and *Albaugh*; after those decisions, it is obviously meritless.  *Shapiro*, 577 U.S. at 46 (cleaned up).

\*     \*     \*

The Court's "close analysis," *Feinberg*, 522 F.2d at 1339, of Plaintiff's case confirms what even a cursory glance suggested: both his primary theory that there is a hitherto-unknown fifty-first state lurking in the District and his fallback position that the Court must unwind two centuries of history and allow D.C. residents to vote for Congress in Maryland are "essentially fictitious" and thus outside the Court's jurisdiction, *Shapiro*, 577 U.S. at 45 (cleaned up).

A final note: Defendant asks the Court to "warn [Plaintiff] that further [frivolous] suits could well . . . lead to the imposition" of a prefiling injunction barring him from filing other cases in this District without leave of court.  Mot. at 18 (cleaned up).  It is true that, were Plaintiff to file so many "frivolous or harassing" cases as to "threaten[] the administration of justice," such an injunction might be appropriate.  *Klayman v. Porter*, 104 F.4th 298, 306-07 (D.C. Cir. 2024) (cleaned up).  But Plaintiff's conduct thus far—filing an amicus brief *in support of the government* in *Castañon*, a complaint dismissed for failure to name the proper defendant in *Page I*, and now this case—does not approach that level.  *See id.* at 306-11 (describing prefiling injunction as "extreme remedy" and "tool of last resort" (cleaned up)).  Indeed, while the Court has had to use some harsh language in analyzing Plaintiff's arguments to assess its jurisdiction over this case, it nonetheless applauds Plaintiff's commitment to his ideals.  Defendant's labeling of Plaintiff as a "vexatious" litigant, Dkt. 26 at 7, is substantially premature.

## IV.    CONCLUSION AND ORDER

The policy arguments against depriving 690,000 D.C. residents of congressional representation are compelling.  Plaintiff's legal arguments are wholly frivolous.  As a result, the Court lacks jurisdiction to hear, and so must dismiss, this case.

For these reasons, the Court hereby **GRANTS** Defendant's Motion to Dismiss, Dkt. 23; **DISMISSES** Plaintiff's Amended Complaint, Dkt. 22, and this case without prejudice; and **DIRECTS** the Clerk of Court to close this case.

**SO ORDERED.**

This is a final appealable Order.  *See* Fed. R. App. P. 4(a).

Date:   July 23, 2024

_____

ANA C. REYES
United States District Judge